UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED

03 OCT 28 PH 1: 08

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| SEAN SCRUGGS, | ] |
| | ] |
| Plaintiff(s), | ] |
| | ] |
| vs. | ]    CV-01-CO-1959-NE |
| | ] |
| ROADWAY EXPRESS, INC., | ] |
| | ] |
| Defendant(s). | ] |

ENTERED

OCT 28 2003

MEMORANDUM OF OPINION

I.    INTRODUCTION.

This is an action brought pursuant to Title VII of the Civil Rights Act of 1964. The court has for consideration defendants's motion for summary judgment, filed September 11, 2002. (Doc. # 44). The issues have been briefed and are now ripe for decision. Upon due consideration, the motion will be granted.

II.    FACTS.

Defendant Roadway Express, Inc. ("Roadway") is a trucking company with a terminal in Huntsville, Alabama. Plaintiff Sean Scruggs is an African-American male who currently is employed by Roadway as a driver.

Roadway's full-time pick-up-and-delivery truck drivers are unionized and covered by a Collective Bargaining Agreement, which permits the drivers to bid on work based on their seniority. The employees do not bid for a particular run, but for a particular start time. Certain runs are associated with certain start times. [Shanks Affidavit, Doc. # 46, Tab 1].

Scruggs was initially hired on April 25, 1997, as a "casual" or part-time driver, and he was hired as a full-time driver on April 18, 1998. [Shanks Affidavit, Doc. # 46, Tab 1].

Scruggs claims Roadway has discriminated against him in (1) job assignments; (2) access to equipment; (3) discipline; (4) overtime; and (5) subjecting him to a racially hostile work environment.[1]

---

[1] [Scruggs' Brief, Doc. # 63, p. 2]. Roadway moved for summary judgment as to all Scruggs' claims, [Doc. # 44], but Scruggs addressed only these specific claims in his responsive submission. Grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned. *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995); See *Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990)("[p]resenting . . . arguments in opposition to a motion for summary judgment is the responsibility of the non-moving party, not the court"). Accordingly, Scruggs' unaddressed claims will be dismissed without further discussion.

III.   STANDARD.

Summary judgment is proper "if the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.

56(c). The party moving for summary judgment "always bears the initial

responsibility of informing the district court of the basis for its motion, and

identifying those portions of [the evidence] which it believes demonstrate

the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986). The movant can meet this burden by presenting

evidence showing that there is no genuine dispute of material fact, or by

showing that the nonmoving party has failed to present evidence in support

of some element of its case on which it bears the ultimate burden of proof.

*Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the

court must view the evidence in the light most favorable to the nonmoving

party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the

nonmoving party to go beyond the pleadings and by her own affidavits, or

by the 'depositions, answers to interrogatories, and admissions on file,'

designate 'specific facts showing that there is a genuine issue for trial.'"

*Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). "A factual dispute

is genuine only if a 'reasonable jury could return a verdict for the

nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d

1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real

Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

IV.   DISCUSSION.

   A.   Scruggs' Disparate Treatment Claims Related to Job
        Assignments, Equipment Access, Overtime and Discipline.

Under the burden-shifting *McDonnell-Douglas* framework,[2] a plaintiff

claiming his employer intentionally treated him less favorably due to his

race must first establish a prima facie case of discrimination by showing: (1)

he belongs to a protected class (2) and was subjected to an adverse job

action (3) while similarly situated employees outside the protected class

---

[2]The plaintiff has not pointed to any direct evidence of discrimination, and relies on circumstantial evidence presented under the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as modified in *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). *See Chapman v. A1 Transportation*, 229 F.3d 1012, 1024 (11th Cir. 2000)(en banc).

were treated more favorably and (4) he was qualified for his job. *Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997).

      1.    Job Assignments.

Scruggs generally alleges that the most physically demanding routes, those with the most hand freight, were discriminatorily assigned to African-American drivers at the Huntsville terminal. He points to Nathan Rozea's testimony in support of this claim, but Rozea did not testify about Scruggs' job assignments. [ Rozea Dep., Doc. # 59, Vol. 2, Ex. 4 (hereinafter, "Rozea Dep."), pp. 320-22]; [Rozea Declaration, Doc. # 84, ¶ 4].[3]

Scruggs testified that job assignments were based on bids and seniority and he was toward the bottom of the seniority list. [Scruggs Dep., Doc. # 59, Vol. 1, Ex. 1, pp. 55-56]. He testified that his route was usually the "south run" or Athens. *Id.* at 58-60. However, he believes that he is assigned the run with the heaviest freight, based on his observation of the

_____

[3]Rozea stated, ". . . Shanks instructed me that whenever I could, I was to assign skid freight to the white employees and hand freight to the African-American employees." Declaration at ¶ 4. However, Rozea did not provide specifics about how often the procedure affected Sean Scruggs' assignments. *Id.* In his deposition, he stated that such choices were made for unassigned drivers, like Ruben Cross and W. T. Smith. [Rozea Dep., p. 321]. Scruggs testified that he only worked with Rozea when he worked the night shift. [Scruggs Dep., pp. 71-72].

loads in the trailers and what Nathan Rozea told him. *Id.* at 58-60, 366-69, 121-30. He said his normal run, the south run, involves a lot of hand freight while the runs for less senior white employees have more pallet freight. *Id.* at 155-57. Stanley Shanks stated that certain start times were associated with certain runs to specific geographic areas. [ Shanks Affidavit, Doc. # 46, Tab 1, ¶ 9]. Scruggs testified that he was told his bid was associated with Athens, but he usually runs the south run. [ Scruggs Dep., pp. 58-61, 154-55].

Although Scruggs testified generally that he was treated differently than white employees with regard to job assignments, he has failed to specify a similarly situated comparator who received more favorable treatment. He pointed to Roadway drivers W. T. Smith, Jeff Childers, and "Dane," but there is no evidence those drivers bid on a similar start time or were otherwise similarly situated. *Id.* at 157-58, 59-60. To the contrary, Scruggs testified Smith and Childers were unassigned, while he had the seniority to bid on a start time. *Id.* at 157-59. To serve as comparators, the plaintiff must show that he and the employees are similarly situated in all relevant respects. *Holifield v. Reno,* 115 F.3d at 1562.

Further, the evidence is that the amount of hand freight is peculiar to the runs, and certain runs are associated with certain start times. Scruggs agreed that his usual run is the south run, but contended he should be able to change runs with less senior employees on days when they have lighter runs. *Id.* at 158-59. To the extent this claim sets out an adverse employment action, Scruggs has not pointed to any white Roadway driver who was allowed to change his run with less senior employees.

2.    Access to Equipment.

Similarly, Scruggs' general contention that African-American drivers at Roadway are assigned inferior trucks is not supported by evidence sufficient to show an adverse employment action.

Scruggs claims on one occasion he was told that the regular truck for the Athens route, 19148, needed repair but he observed a white driver using 19148 that day. [Scruggs Brief, Doc. # 63, pp. 4-5]; [Scruggs Dep., pp. 132-37, 144, 147].[4] On other occasions he drove 19148. [Scruggs Dep., p. 138]. Although he testified that he did not always get the trucks he liked, he did

_____

[4]There is no evidence that the white driver was similarly situated and there is no evidence that the truck Scruggs drove that day was inferior to 19148.

not specify any other time when a white driver got the truck he preferred. [Scruggs Dep. pp. 132-154]. He testified that some trucks are more convenient, in that they have power steering, a better seat, more maneuverability or a better ride. [ Scruggs Dep. pp. 138-39]. Scruggs further testified that broken equipment was fixed with minimal delay and that he never had to drive broken equipment. [Scruggs Dep. pp. 153-54].[5]

Although there is no bright-line test for what constitutes an adverse employment action, it is clear that not all conduct by an employer negatively affecting employment constitutes an adverse employment action. *Davis v. Town of Lake Park, Florida,* 245 F.3d 1232, 1238 (11th Cir. 2001).

> "Although the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment. We therefore hold that, to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious* and *material* change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the

---

[5]Scruggs also relies on Rozea's testimony that he was instructed by Shanks to treat white employees better than black employees whenever possible, and his statement that he understood he was to give newer equipment to white employees. [Scruggs' Response, p. 5; Rozea Dep., p. 239; Rozea Dec., ¶ 6]. However, Rozea did not specifically testify about Scruggs' equipment assignments.

> significance and adversity of the employer's action is not
> controlling; the employment action must be materially adverse
> as viewed by a reasonable person in the circumstances.

*Davis*, 245 F.3d at 1239-40 (emphasis in original). Not all conduct by an

employer negatively affecting an employee constitutes an adverse

employment action; there must be some threshold level of substantiality

that must be met for unlawful discrimination to be cognizable. *Id.* at 1238-

39 (citations omitted). "'A tangible employment action constitutes a

*significant* change in employment status, such as hiring, firing, failing to

promote, reassignment  with *significantly* different responsibilities, or a

decision causing a *significant* change in benefits.'" *Id.*, *citing Burlington*

*Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998)(discussing supervisor's

vicarious Title VII liability for sexual harassment)(emphasis in original).

    Although the Eleventh Circuit has not spoken to the issue, several

courts have said that assignment of inferior equipment is not an adverse

employment action. *See Geer v. Marco Warehousing, Inc.,* 179 F. Supp. 2d

1332, 1341 (M.D. Ala. 2001)(improperly functioning cleaning equipment);

*Jacob-Mua v. Veneman*, 289 F.3d 517, 522 (8th Cir. 2002)(inferior

equipment); *Markel v. Bd. of Regents*, 276 F.3d 906, 911 (7th Cir.

2002)(plaintiff denied better equipment).  Particularly here, where the plaintiff does not claim his equipment was broken or otherwise unsafe or unusable, but only claims that some trucks were subjectively preferable to others, his claim does not rise to the level of an adverse employment action.

      3.    Overtime Hours.

Similarly, Scruggs' claim that he was required to work overtime when white employee W. T. Smith could have done the required work without overtime does not constitute an adverse employment action.  Scruggs specified one instance in which he was required to work one hour overtime when Smith was also available, and he testified generally that there were similar occurrences on a few other occasions.  [Scruggs' Brief, Doc. # 63, p. 6]; [Scruggs' Dep., Doc. # 59, Vol. 1, pp. 162-65].  He does not claim he was insufficiently compensated for the overtime.  *Id.*  A reasonable person in these circumstances would not consider working required short periods of overtime on a few occasions to constitute a "serious and material" change in the terms, conditions, or privileges of employment.  *Davis,* 245 F.3d at 1239-40.  Further, Scruggs did not provide any evidence that W. T. Smith was similarly situated in all relevant respects.

      4.    Discipline.

In October of 1999, Scruggs received a five day suspension for inadvertently backing his truck into a pallet of marble at a customer's place of business.  Roadway points to evidence that Scruggs' accident resulted in $6,738 in damage, and that he was disciplined according to Roadway's policy that drivers who, due to their carelessness, are in accidents that have damages in excess of $5,000, may either be discharged or accept a five day suspension. [ Roadway Brief, Doc. # 45, p. 7]; [Shanks Aff., Doc. # 46, Ex. 1, at ¶ 14]; [Doc. # 46, Ex. 9.]   Scruggs testified that he was told his accident resulted in over $5000 in damage and that he did not know any other Roadway employee who had been involved in an accident resulting in an amount of damage comparable to his accident. [ Scruggs' Dep., Doc. # 59, pp. 235-238].   Roadway argues that Scruggs does not point to any similarly situated comparator outside his protected class who was treated differently.  In this regard, Roadway argues the only proper comparator is one whose preventable accident resulted in more than $5,000 damage. [Roadway Brief, Doc. # 45, pp. 7-8, 23-26].  This court agrees.

> To make a comparison of the plaintiff's treatment to that of
> non-minority employees, the plaintiff must show that he and the
> employees are similarly situated in all relevant respects. . . . In
> determining whether employees are similarly situated for
> purposes of establishing a prima facie case, it is necessary to
> consider whether the employees are involved in or accused of
> the same or similar conduct and are disciplined in different
> ways.

*Holifield v. Reno*, 115 F.3d at 1562.

Scruggs contends (1) white employee Jeff Smith was not disciplined

when he hit a telephone pole and dragged it behind his truck; (2) white

employee Larry Jones was not disciplined when he hit and damaged a truck

at Roadway's terminal; and (3) white employee Randall Boyd was not

disciplined when an accident caused the bumper to pull off the truck he was

driving.  He has not pointed to any evidence that these accidents resulted

in damages greater than $5,000.[6]  Accordingly, these men are not similarly

---

[6]On June 20, 2003, after briefing of the summary judgment motion was complete, the plaintiff, with the court's permission, submitted the affidavit of Nathan Rozea, who stated that white employees Smith, Boyd, and Jones committed similar offenses and did not receive written reprimands or suspensions. Doc. # 84, ¶ 8. Rozea stated that his declaration was made on personal knowledge. *Id.* at ¶ 1. However, Rozea merely attested that the white employees committed "similar offenses" and that "the only difference between these employees and Scruggs is that they are all white and he is African-American." *Id.* at ¶¶ 8-9.  He did not address Roadway's policy regarding accidents resulting in damages in excess of $5,000, nor did he state he had personal knowledge of the amount of damages involved in each accident. Therefore, Rozea's conclusory statement does not contradict Roadway's evidence that the accidents were dissimilar and does not create a triable question of fact. *See* Shanks Aff., Doc.

situated and summary judgment is due on Scruggs' claim of disparate disciplinary treatment.

Alternatively, Roadway's policy of requiring termination or five day suspension of those employees who have caused accidents resulting in over $5,000 damage is a legitimate, non-discriminatory reason for the discipline and Scruggs has not demonstrated that Roadway's articulated reason is a mere pretext for discrimination. *Holifield,* 115 F.3d at 1564-66.

B.    Hostile Work Environment.

To establish a hostile work environment claim under Title VII, the plaintiff must show "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993), *citing Meritor Savings Bank v. Vinson,* 477 U.S. 57 (1986). To prevail on a claim that he has been subjected to a racially hostile work environment, the plaintiff must present sufficient evidence to show: (1) he belongs to a protected group; (2) he was subjected to unwelcome

---

# 46, Ex. 1, ¶¶ 14-15.

harassment; (3) the harassment was based on a protected characteristic of the employee, such as race; (4) the harassment was sufficiently severe and pervasive to alter the terms and conditions of employment and create an abusive working environment; and (5) the employer is responsible for such environment under either a theory of vicarious or direct liability. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

Roadway claims Scruggs cannot show he was subjected to harassment sufficiently severe and pervasive as to alter the terms and conditions of his employment. Harassing conduct is severe or pervasive if it results in (1) an environment that a reasonable person would find hostile or abusive; and (2) an environment that the victim subjectively perceives to be abusive. *Harris*, 510 U.S. at 21-22. In evaluating the objective severity of harassing conduct, the court must consider the totality of the circumstances, including: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Miller*, 277 F.3d at 1276. "[C]laims of employment discrimination . . . present fact intensive issues. However. . .

Page 14 of 21

motions for summary judgment or judgment as a matter of law are appropriate to 'police the baseline for hostile environment claims.'" *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1244 (11th Cir. 1999)(en banc)(quoting *Indest v. Freeman Decorating, Inc.,* 164 F.3d 258, 264 n. 8 (5th Cir. 1999)).

In support of his hostile work environment claim, Scruggs testified: (1) he heard Stanley Shanks[7] say, ". . . that boy, he should have been here today" in reference to James Sanders, an African-American driver; (2) he heard Phil Massey[8] say, "I am going to take my belt off and spank you," to Troy Brazelton, an African-American driver, on seven or eight occasions; and (3) in June 1999, he saw two dolls he believed were racially offensive hanging on Roadway's bulletin board.[9] [Scruggs Dep., pp. 78-109]. Scruggs

---

[7]Shanks is the Huntsville terminal manager. [Shanks Affidavit, Doc. # 73, Ex. 3].

[8]Phil Massey is a dispatcher at Roadway. [Scruggs Dep., p. 429.]

[9]The evidence about the appearance of the doll display is inconsistent. Scruggs testified he saw two dolls, one larger white textured doll with dreadlocks hanging by a rope around its neck from the bulletin board and one "brown textured" doll with no discernable hair hanging by a tack from the bulletin board. [Scruggs Dep., pp. 92-108.] One doll had a note under it that said, "Today is not your day," or words to that effect. *Id.* Scruggs thought the brown textured doll was supposed to be an animal, but felt the white textured doll was "like a racial thing here in the south that reminds [him] of . . . heritage" he does not like. [Scruggs Dep., p. 96. Maurice Jefferson testified he saw two dolls made of black cotton material with dreadlocks for hair hanging by a string around their necks on a board near the dispatcher's office. [Jefferson Affidavit, Doc. # 59, Vol 2, Ex. 4, pp. 262-70]. Jefferson did not complain

also testified that, in a mid-1999 conversation, Nathan Rozea told him

Shanks said black employees should be referred to as "snakes" and another

employee said "everybody should have a nigger working for them." [Scruggs

Dep., pp. 84, 89].[10]  Scruggs, however, testified that he did not hear Shanks

or any Roadway employee other than Rozea use offensive language.

[Scruggs Dep., pp. 81-83, 90-91].  He also testified that "it crossed [his]

mind" that Rozea was not being truthful with regard to the statements

about Shanks' language.  [Scruggs Dep., pp. 439-41].

Scruggs did not present any evidence that he complained about the

remarks, but he testified he complained about the dolls to Shanks more than

---

about the dolls because Sean Scruggs had already complained. *Id.*  The defendant submitted
a photograph, which Stanley Shanks stated was a true and correct photograph of the only doll
ever posted at the Huntsville terminal to his knowledge. [Doc. #43, Affidavit of Stanley
Shanks].  The black and white photocopied photograph depicts one pale doll with short,
possibly curly hair attached to the bulletin board by no visible means.  A sign, similar to one
described by Sean Scruggs, is near the doll.  There is no evidence that Scruggs was ever shown
the photograph or agreed that it depicted the display he saw.  Since the defendant has the
burden of proving there is no dispute of material fact, the court has presumed the display was
as Scruggs described for the purpose of deciding this motion for summary judgment.

[10]Rozea stated that he heard Shanks use the term "nigger" on more than one occasion,
and that Phil Massey referred to a pet as "nigger."  [Rozea Decl., ¶ 5].  Scruggs, however,
testified that he did not hear Shanks or any Roadway employee other than Rozea utter the
pejorative.  [Scruggs Dep., pp. 81-83, 90-91].

once during the two to three weeks they were displayed, and the dolls were removed shortly after his last complaint.

The conduct of which Scruggs complains is not sufficiently severe or pervasive to alter the conditions of employment and create a working environment that a reasonable person would find hostile or abusive. *See Mendoza*, 195 F.3d 1247-53 (discussing sufficiency of sexually hostile work environment showing). As noted above, in evaluating the objective severity of harassing conduct, the court must consider the totality of the circumstances, including, among other factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Miller*, 277 F.3d at 1276.

The comments Scruggs heard at Roadway were not frequent, and most are not severe. Scruggs had worked at Roadway a little over four years at the time he filed his complaint in this action. While he testified to hearing

several comments over the years,[11] the severity of these comments is questionable since they are devoid of any context which would transform their facial neutrality into racial harassment.[12] The comments Rozea passed on were offensive in any context, but Scruggs testified that such comments were not in his personal experience; he spoke with Rozea about the matter on only one occasion, and he doubted Rozea's veracity.  Considering all the comments of which Scruggs complains, he remembered only a dozen occasions that he heard offensive comments during his four years of employment at Roadway and he never complained about anything he heard in the workplace.    *See Miller*, 277 F.3d at 1276 (repeated incidents of verbal harassment that continue despite the employee's objections are indicative of a hostile work environment).

---

[11]Scruggs did not specify any time frame in which he heard the comments, except that he said his conversation with Rozea was in mid-1999.

[12]In considering this motion for summary judgment, the court has accepted Scruggs' position that  the comments he heard had racial overtones but notes that the "boy" and "spanking" references are ambiguously hostile, at best. *See Mendoza*, 195 F.3d at 1247-48 (discussing possible asexual nature of conduct and comments).

The doll display, as described by Scruggs, is not, by itself or in conjunction with the comments Scruggs heard,[13] sufficient to establish Scruggs' hostile environment claim.  Although Scruggs testified that he subjectively viewed the display as "racial," the undisputed evidence is that Shanks said the doll was a "dammit doll," and that "one takes out his or her frustrations on [such] a doll."  [Scruggs Dep., p. 108].  There is no evidence that the doll Scruggs saw was intended to be anything more, or that a reasonable person would have the same perception of the display that Scruggs had.  Statements and conduct must be racially related before they are to be considered in determining whether the severe or pervasive requirement is met.  *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000)(discussing sexually hostile environment claim).  While the doll display angered and offended Scruggs, there is no evidence that it was intended to be offensive.   Innocuous comments or conduct, even if it is boorish, is not considered in evaluating a hostile work environment claim, since Title VII is not a "general civility code."  *Gupta*, 212 F.3d t 583.

---

[13]Scruggs viewed the doll display about the same time he had a conversation with Rozea.

Scruggs has not shown that any of the events he described, including the doll display, interfered with his job performance to any degree. *Miller*, 277 F.3d at 1276. Furthermore, there is no evidence of physically threatening or humiliating activity at Roadway. *Id.* Scruggs does not contend, and there is no evidence, that the doll display or the comments were directed at him personally and he does not claim he felt threatened or humiliated.

Based on this record, a jury could not find Scruggs has been subjected to an objectively severe hostile work environment at Roadway. Given the infrequency of the alleged incidents, the dearth of evidence that they had any impact on Scruggs' day-to-day work, the absence of any personal threat or humiliation, the minimal amount of objectively offensive activity, and considering the totality of the circumstances, this court must conclude Scruggs did not experience harassing conduct that was so objectively severe and pervasive as to alter the terms and conditions of his employment.[14]

---

[14]Because Scruggs failed to satisfy his burden of showing that he suffered severe and pervasive harassment, the court need not reach Roadway's argument that Scruggs unreasonably failed to take advantage of its anti-discrimination policy and attendant complaint procedure. *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305 (11th Cir. 2001)(if the plaintiff satisfies his burden, the defendant-employer is entitled to assert the *Faragher-Ellerth* affirmative defense). Scruggs testified he knew about Roadway's policy. [Scruggs Dep., p. 277]. There is no dispute that he failed to complain about the comments and Scruggs did not participate in the anonymous letter writing campaign which prompted supervisor Huneryager's investigation. Although Scruggs did complain to Shanks about the doll display, the display was not objectively offensive.

## V.   CONCLUSION.

The court will enter an appropriate order in conformity with this opinion.

Done, this _____ of October, 2003.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE